The Smoot Sand & Gravel Corporation v. Commissioner.
Smoot Sand & Gravel Corp. v. Commissioner
Docket Nos. 31570, 47411, 52015.
United States Tax Court
T.C. Memo 1956-82; 1956 Tax Ct. Memo LEXIS 214; 15 T.C.M. (CCH) 418; T.C.M. (RIA) 56082; April 10, 1956
David R. Shelton, Esq., Munsey Building, Washington, D.C., for the petitioner. Paul E. Waring, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding involves income tax deficiencies for the years 1945 to 1950, inclusive, as follows: Docket No.
Year
Deficiency
31570
1945
$ 83,638.95
31570
1946
91,360.29
31570
1947
136,505.50
31570
1948
123,778.83
47411
1949
26,458.08
52015
1950
37,092.41 The only issue is whether petitioner is subject to the surtax imposed by section 102 of the Internal Revenue Code of 1939. Other issues raised in the pleadings *215 have been conceded by petitioner. The alleged section 102 net income and surtax are as follows: Alleged
Alleged
Section 102
Section 102
Year
Net Income
Surtax
1945
$ 208,223.94
$ 69,166.22
1946
237,476.03
80,428.27
1947
356,230.82
126,148.87
1948
319,777.10
112,114.18
1949
96,211.21
26,458.08
1950
124,915.35
37,092.41
Total
$1,342,834.45
$451,408.03
Petitioner further contends that in determining its liability for section 102 surtax for the taxable years involved, the respondent did not comply with the requirements of the statute, particularly as to the effect that the distribution of earnings and profits would have had upon the tax liability of the stockholders, and that the proposed assessments are therefore invalid. Findings of Fact Petitioner is a Delaware corporation, organized September 1, 1927, with its principal office and place of business located in Washington, D.C. Its returns for the years involved were filed with the collector of internal revenue for the district of Maryland. Petitioner owns and operates a sand and gravel business. It acquired the business from a predecessor corporation, The Smoot Sand & Gravel *216 Corporation of Virginia, in September 1927, in a nontaxable reorganization. The assets were set up in petitioner's books at a value slightly in excess of $3,000,000. The actual value of the assets at the time was not less than $5,000,000. The business was founded by L. E. Smoot about 1899. It was operated by him as a sole proprietorship until about 1922 when it was transferred to petitioner's predecessor. It was operated by that company until acquired by petitioner in 1927. Petitioner, the Delaware corporation, was organized with 300 shares of capital stock of no-par value. These shares, together with $3,000,000 face value of its debenture bonds, were issued in a reorganization to a newly organized Canadian corporation, The Smoot Sand & Gravel Corporation of Canada, Limited, in 1927. The assets of the Canadian Corporation, including the 300 shares of petitioner's capital stock and the remainder of petitioner's bonded indebtedness amounting to $2,150,000, were transferred to Columbia Sand & Gravel Company, Inc., a Delaware corporation, hereinafter sometimes referred to as Columbia, in 1939, in exchange for its capital stock consisting of 306 common and 250 preferred shares. The *217 Canadian corporation had issued and outstanding 306 shares of common stock, all of which was owned by L. E. Smoot, and 250 preferred shares owned by other persons. The Columbia shares were distributed to the shareholders of the Canadian corporation, share for share, and that company was dissolved. L. E. Smoot, as the owner of all of the common stock of the Canadian corporation, thus became the sole owner of the common stock of Columbia. He is also president of petitioner and chairman of its board of directors. Petitioner's business operations consist principally of mining, processing and selling sand and gravel used in concrete construction. Petitioner has three plants located in the District of Columbia known as the Georgetown plant, the Southeast plant, and the Capitol plant. Petitioner obtains its sand and gravel largely from deposits located along the Potomac River below Washington, D.C. and adjacent waters, which it transports to its plants by water. The deposits vary in size from a few acres to several hundred acres. Generally, they are under water and are recovered by dredging operations. The gravel content largely determines the value of the deposit, sand being more of a *218 by-product. The following are some of the construction projects in the Washington area for which petitioner has furnished sand and gravel: Shoreham Hotel, Gallinger Hospital, Department of Commerce building, the Supreme Court building, Department of Interior building, Lincoln Memorial Bridge, Georgetown Hospital, George Washington Hospital, Doctors Hospital, Statler Hotel, David Taylor Naval Model Testing Basin, Dalecarlia Reservoir, D.C. Aqueduct, Potomac River Bridge, Morgantown, Maryland, Fourteenth Street Bridge, South Capitol Street Bridge, Mount Vernon Boulevard, the Pentagon building, and principal streets, highways, alleys and sewers. Petitioner designs and builds its dredges and much of its other equipment. The dredges are large, complicated structures containing an endless, power-driven chain with steel buckets attached which dig into the underwater deposits and elevate the sand and gravel up to receiving hoppers located in the upper structure of the dredge. From these hoppers the sand and gravel are separated, cleaned and sized by a process of screening and washing, and loaded on barges, or scows, alongside the dredge. The barges are then towed by tugs to petitioner's *219 plants or distribution points located in the District of Columbia. A standard tow of loaded barges consists of four to six barges to one tug. Their rate of travel up the river is about 5 miles per hour. There is usually an overburden of mud or clay or other extraneous matter in the sane and gravel deposits which has to be removed in the dredging process. This overburden may be as much as 18 to 20 feet thick. With that much overburden it becomes unprofitable to work the deposit. The gravel sometimes requires further processing, such as crushing and sizing, at the plants. The sand is usually completely processed at the dredge. At the plants the sand and gravel are stored in overhead bins for ready loading into customers' trucks. Some of these products go directly into ready-mix concrete trucks, to which is added cement and water in proper proportions. Petitioner does not sell or handle cement but does provide bins for its storage which are rented to the ready-mix concrete customers. Petitioner sometimes delivers barge loads of sand and gravel directly to the customer's project. Prior to 1940 a large portion of its business was the sale and delivery of sand and gravel in barge loads *220 to points down the Potomac and Patuxent rivers and adjacent waters within an area of approximately 200 miles. The "down-river" business was abandoned about 1940 due to the fact that all of petitioner's facilities for production were required to supply the wartime demands for new construction in the Washington area. Petitioner's floating equipment consists of dredges, barges, or scows, tugboats, and launches. The following is a list of such equipment which petitioner owned in 1940, and the date of its construction or acquisition: Floating Plant
Year Built
and Equipment
or Acquired
Tug Mead
1903
Dredge No. 1
1909
Launch Tindeco
1910
Launch Helen Rose
1914
Tug Herbert
1914
Dredge No. 4
1916
Dredge No. 6
1917
Dredge, Jr.
1921
Tug Eugenia
1921
1 barge
1922
1 barge
1923
6 barges
1924
Dredge No. 3
1924
Dredge No. 7
1925
Tug McNeale
1925
6 barges
1925
Dredge No. 8
1925
2 barges
1927
4 barges
1928
Dredge No. 5
1928
47 barges
1929 and prior
6 barges
1931
Tug Columbia
1931
3 barges
1936
Tug Virginia
1937
10 barges
1939
Petitioner's Washington plants are equipped with docks, warehouses, power shovels, machinery for crushing *221 and sizing the gravel, elevators, storage bins, and other various types of equipment. Most of this equipment is heavy and expensive. The overhead concrete storage bins hold as much as 25,000 tons of sand and gravel. They are equipped with automatic weighing devices which accurately measure the quantity of each batch of material as it is dumped into the customers' trucks or concrete mixers. Petitioner also maintains its own shipyards and repair shop. Ordinary machine shops are not able to handle its heavy floating equipment. Petitioner does not maintain a marine railway. Up to about World War II, it was permitted to use the Navy Yard marine railway and other facilities for repair work on its floating equipment, but this privilege was withdrawn. Petitioner's dredges, tugs and steel barges now have to be taken to Norfolk, Virginia or Chesapeake City, Maryland for repairs. The increased demand for sand and gravel for wartime construction in the Washington area was greater than petitioner and other producers could meet. Petitioner made every effort to meet the Government's demand for increased production. Almost its entire output, for a considerable length of time, was taken up in *222 the construction of the Pentagon building and its accesses. Petitioner had a large stock pile of sand and gravel in reserve but this was exhausted by 1944. It operated on a double shift, 20 hours a day schedule, during most of the period 1940 to 1944, inclusive. All of its production equipment was severely taxed. Generally, it was idle only long enough for necessary repairs. The cost of heavy construction contracts, which form the basis for the sand and gravel industry, awarded in petitioner's marketing area over the period 1933 to 1953, and petitioner's production during that period, were as follows: Amount
Cubic Yards
of Heavy
of Sand
Construction
and Gravel
Year
Contracts Awarded
Produced
1933
$ 22,651,000
1,001,975
1934
31,999,000
829,930
1935
72,223,000
876,445
1936
75,845,000
1,081,900
1937
96,606,000
999,370
1938
78,659,000
993,990
1939
119,512,000
1,349,443
1940
116,046,000
1,697,381
1941
193,137,000
1,832,250
1942
218,973,000
2,009,375
1943
88,988,000
1,243,125
1944
64,279,000
806,750
1945
105,800,000
861,375
1946
218,892,000
823,875
1947
242,203,000
1,036,035
1948
227,581,000
1,058,375
1949
340,316,000
728,325
1950
368,928,000
1,069,012
1951
307,390,000
920,375
1952
244,160,000
841,895
1953
(not shown)
848,650
*223 Petitioner's expenditures for repairs increased more or less constantly from about $36,000 in 1922 to $220,000 in 1939, and over $330,000 in 1942. Its total cost of repairs for the period 1940 to 1953 was approximately $3,811,600. Very little new equipment was built or purchased during this latter period. There was a wartime scarcity of equipment, such as petitioner required, as well as material for repairs. At the close of World War II much of petitioner's production equipment was in a run-down condition and badly in need of replacement. Petitioner did not undertake any large scale replacement program after material and equipment became available, largely because of the belief of its officers, and particularly of its owner, L. E. Smoot, that war-inflated prices were too high and that they would soon return to something like prewar levels. Instead, however, prices for the types of equipment needed by the petitioner continued to advance and the supply remained short. During the years 1945 to 1950, inclusive, petitioner acquired land and equipment as follows: Description
Year
Cost
Steel scows
1945
$152,178.88
Adding machine
1945
206.40
Land
1945
4,256.61
Automobile
1946
1,871.54
Hough loader
1946
4,950.00
Automobile
1947
1,275.84
Road grader
1947
542.00
Steel scows
1947
160,000.00
Friden calculator
1947
458.93
Land
1947
40.00
Refrigerator -
5914 - 4th St.
1948
174.50
Automobiles
1948
5,161.49
Air compresser
1948
2,550.00
Tug Rosalie
1948
18,817.47
Steel scows
1948
173,000.00
Bookkeeping machines
1948
3,556.56
Dredging rights
1948
15,000.00
Automobile
1949
1,163.55
Electric welder
1949
925.00
Tug Rosalie
1949
3,322.67
Steel scows
1949
180,000.00
Land
1949
200.00
Automobiles
1950
5,547.65
Tug Woodward
1950
36,159.82
*224 During the period 1940-1945 petitioner had 4 dredges and 87 scows in operation. The following table shows the number of wooden scows and steel scows operated by petitioner in each of the years 1940 to 1953, inclusive: Year
Wooden
Steel
1940
74
13
1941
74
13
1942
72
13
1943
71
13
1944
64
13
1945
52
23
1946
49
23
1947
33
23
1948
15
33
1949
5
43
1950
4
53
1951
4
58
1952
4
58
1953
3
59
The steel scows are about 40 per cent more efficient in carrying capacity than the wooden scows. The 40 steel scows acquired by the petitioner over the period 1945-1949 had an aggregate cost of $665,178.88. From about 1939 until 1950, petitioner was mining most of its sand and gravel from nearby deposits located within a distance of not more than 15 miles from its Georgetown plant. By 1950 the best of these deposits, particularly the gravel deposits, had been exhausted and petitioner found it more economical to begin mining deposits further down the river. Some of petitioner's most available nearby deposits were taken over by the Government in condemnation proceedings. Petitioner had an adequate supply of down-river deposits but the nearest *225 of these were from 20 to 50 miles from its Georgetown plant. Working these more distant deposits increased the transportation problem and required a greater usage of floating equipment. Petitioner has not been able to supply the requirements of its customers for sand and gravel since about the beginning of World War II. In 1943 it inaugurated a system of allocating material to its customers which has continued up to the present time. In some instances customers' requirements had to be cut in half. For a number of years the ready-mix concrete business has been developing rapidly both on a national scale and in the Washington, D.C. area. It was firmly established by about 1940 and at the present time it constitutes the larger portion of the concrete business. In the ready-mix concrete business the sand, gravel, cement, and water are loaded in the mixing trucks at the plant in the proper proportions for the type of concrete required and the mixed concrete is delivered at the construction job ready for use. Under the old method, the sand and gravel were delivered to the project and mixed on the premises either by hand or in stationary mixers. In the beginning the ready-mix business *226 was operated independently of the sand and gravel business, such as petitioner's. However, many of the sand and gravel producers have themselves gone into the ready-mix business in order to protect their market. Also, many of the ready-mix concerns have gone into the sand and gravel business to obtain their supplies of material. The general trend has been toward a merger of the two branches of the industry. In the Washington, D.C. area, as well as in most other large construction areas, the ready-mix industry has become the dominant factor in the concrete market. Several of the large ready-mix concerns in the Washington, D.C. area have purchased some or all of their sand and gravel from the petitioner. As their business expanded, petitioner was unable to supply their demands for sand and gravel and they were forced to look to other sources. In the meantime, the ready-mix concerns began demanding certain price concessions and other concessions which petitioner was unable or unwilling to grant, and transferring as much of their business as possible to petitioner's competitors. By 1945 this situation had reached the point where, in the opinion of petitioner's officers, it constituted *227 a severe threat to petitioner's business. Petitioner was confronted with the alternative of going into the ready-mix business itself or losing the major portion of its sand and gravel market. Petitioner had always favored the development of the ready-mix business as a separate industry from the sand and gravel business and had given substantial financial assistance to several of its ready-mix customers. At one time when the strained relationship between petitioner and the ready-mix concerns approached a climax, petitioner made an estimate of the additional facilities and equipment that it would need to go into the ready-mix business itself, and engaged a "stand-by" salesman to handle the order. A break with the ready-mix concerns was averted, however, and at the present time they are purchasing from 50 to 80 per cent of petitioner's production of sand and gravel. In addition to the loans which petitioner made to ready-mix concerns, it also made loans from time to time to its other customers for the purpose of helping them acquire title to sites for proposed construction projects or to get established in the construction business. Such loans amounted to approximately $437,500 over *228 the period 1945 to 1950. Since about the middle 1940's petitioner has been confronted with the necessity of establishing outlying plants or distribution stations to take care of construction in the rapidly expanding suburban areas of Maryland and Virginia. Because of the long hauls from its present plants to these areas and the congested city traffic, its supplies of sand and gravel are becoming more and more inaccessible to many of its customers. Production plants in the off-river suburban areas would have to be supplied from nearby land sand and gravel deposits or by long hauls of sand and gravel from petitioner's barges. In 1940 the Antitrust Division of the Department of Justice attempted to have L. E. Smoot indicted by Grand Jury in the District of Columbia on the ground that petitioner's business constituted an illegal monopoly. The indictment was refused, and immediately thereafter, in October 1940, a suit was brought in equity against petitioner by the Department of Justice in the District Court for the District of Columbia seeking its dissolution under the Sherman Antitrust Act. The suit, if successful, might have placed petitioner under a receivership and might have required *229 the disposal or dispersal among several separate entities of all of its assets. This suit was dismissed by the court on November 19, 1945. At the close of 1945, there was pending before the Bureau of Internal Revenue petitioner's offer to pay to the Commissioner a net amount of approximately $605,000, plus interest, in settlement of the then existing claims against petitioner, The Smoot Sand & Gravel Company of Canada, Limited, the Columbia Sand & Gravel Company, Inc., and L. E. Smoot, personally, for income taxes, excess profits taxes, and surtaxes, for the years 1938 to 1944, inclusive. Of that amount $604,556.94 was for petitioner's liability. The Commissioner finally rejected this offer of settlement in August 1946 and increased the additional taxes alleged to be due from those taxpayers by several hundred thousand dollars. On September 24, 1946, notices were sent to the petitioner, the Columbia Sand & Gravel Company, Inc., and to L. E. Smoot, individually, of deficiencies in income taxes, excess profits and surtaxes, as follows: Petitioner corporation - Deficiencies in income and excess profits taxes for the years 1940 to 1944, inclusive, in the aggregate amount of $922,619.84. *230 This amount included section 102 surtax for 1943 and 1944. Columbia Sand & Gravel Company, Inc. - Deficiencies in personal holding surtax for the years 1940, 1941 and 1942 in the aggregate amount of $918,677.15. L. E. Smoot - Deficiencies in income tax for the years 1938, 1943 and 1944 in the total amount of $248,515.73. Petitions were filed in the Tax Court by each of the above taxpayers, and on October 5, 1949, the Tax Court, pursuant to stipulation of settlement, entered its decisions of deficiencies in the total amount of approximately $302.400. The aggregate amount of petitioner's deficiencies was $301,512.06. These amounts were paid during 1949 and 1950. The following table shows petitioner's net income, including nontaxable income and capital gains, the total of its bond indebtedness and accounts payable, its estimated income tax liability for each of the years 1945 to 1950, inclusive, and the additional income tax liability, including section 102 tax, and estimated interest, determined by the Commissioner and pending at the close of each of those years: Additional
Bond
Admitted Esti-
Income Tax Lia-
Total
Indebtedness and
mated Income
bility Determined
Year
Net Income
Accounts Payable
Tax Liability
by Commissioner
1945
$338,493.86
$1,268,725.88
$123,300.94
$ 723,166.73
1946
371,600.74
1,306,009.54
134,727.08
1,155,907.50
1947
563,101.54
1,342,768.46
215,279.11
1,717,317.99
1948
500,096.91
1,379,676.51
187,514.80
1,794,562.00
1949
302,165.61
1,415,683.75
110,182.68
434,803.71
1950
673,325.29
1,461,856.90
274,798.38
516,275.17
*231 The outstanding tax claims of the Commissioner against Columbia Sand & Gravel Company, Inc., and L. E. Smoot, individually, at the close of each of the years 1946 to 1949, inclusive, were as follows: Determination
Against Columbia
Determination
Sand & Gravel
Against
Date
Company, Inc.
L. E. Smoot
Dec. 31, 1946
$1,243,022.42
$379,827.69
Dec. 31, 1947
1,298,143.05
394,738.63
Dec. 31, 1948
1,353,263.67
409,649.58
Oct. 1, 1949
1,394,604.14
420,832.78
In the determination of the deficiencies here involved, a revenue agent in the office of the Commissioner of Internal Revenue made an examination of petitioner's returns for the taxable years 1945 to 1948, inclusive, and recommended that petitioner be held subject to tax under section 102 of the Internal Revenue Code of 1939. His report was adopted as a basis of the notices of deficiency for those years. In the preparation of his report, the examining agent did not make any computation of what would have been the tax result to the Columbia Sand & Gravel Company or to L. E. Smoot, individually, had petitioner made distributions of its earnings and profits during those years. He did ascertain, *232 however, from files in the Commissioner's possession, the stockholder relationship between the petitioner, the Columbia Sand & Gravel Company and L. E. Smoot, and that for each of the taxable years L. E. Smoot was in a high income tax bracket. Other steps were taken by duly authorized employees or officials of the Bureau of Internal Revenue, in the performance of their ordinary duties, relating to the determination of the deficiencies against the petitioner and the issuance of the notices of deficiency for the years here involved. Prior to the issuance of these notices, a report was prepared by a technical adviser and one or more conferences were held with petitioner's counsel and its officers. Petitioner is a complete self-insurer with respect to all of its sand and gravel equipment, except for a small amount of liability insurance on automobiles operated by its employees. The self-insurance categories include workmen's compensation under the Workmen's Compensation Act of the District of Columbia, fire, tornado, public liability and property damage, marine liability, and performance bonds. In its books, petitioner set up reserves for contingent liability in respect of these various *233 insurance obligations but in actual practice any liabilities that occurred were either charged to expenses or capitalized and not charged against the reserves. In 1953 petitioner had an appraisal made of its business and facilities by the American Appraisal Company. This was done primarily for the purpose of supporting the contentions advanced by petitioner in this proceeding. It was found in the appraisal as follows: (1) That the cost of reproduction new of all of petitioner's depreciable properties used in the production of said and gravel during the years 1945 to 1950, inclusive, the cost of reproduction less depreciation, and the depreciation sustained as of December 31st of each of the years, were as follows: Cost of
Depreciated
Depreciation
Reproduction New
Value
Sustained
December 31, 1945
$4,049,750.77
$1,722,151.39
$2,327,599.38
December 31, 1946
4,584,120.41
1,870,897.14
2,713,223.27
December 31, 1947
5,484,066.60
2,226,754.43
3,257,312.17
December 31, 1948
5,911,826.17
2,443,471.98
3,468,354.19
December 31, 1949
6,204,981.85
2,514,841.54
3,690,140.31
December 31, 1950
6,228,694.06
2,525,563.52
3,703,130.54
(2) *234 That the cost of additional production facilities deemed essential by the operating management to the maintenance of petitioner's relative position in the industry, based on a production of 1,500,000 cubic yards of sand and gravel, would have been as follows in each of the years 1945 to 1950, inclusive: 1945
$2,303,050
1946
2,606,150
1947
2,962,200
1948
3,207,900
1949
3,373,000
1950
3,559,400
(3) That the reserves required at the end of each of the taxable years, 1945-1950, inclusive, to provide for depreciation sustained on existing facilities and for replacement of needed facilities, would have been as follows: 1945
$4,366,489.38
1946
4,989,180.72
1947
5,805,674.79
1948
6,202,949.51
1949
6,558,447.59
1950
6,700,733.16
Following is a schedule of the contingent reserves carried on petitioner's books at December 31, 1944 and December 31, 1950, with a description of the major items: Reserve for:
December 31, 1944
December 31, 1950
Accrued bond interest
$ 615,203.29
$ 836,783.29
Contract bonds
250,000.00
250,000.00
Workmen's insurance
150,000.00
200,000.00
Public liability
100,000.00
200,000.00
Fire and tornado insurance
250,000.00
250,000.00
Sand and gravel replacement
100,000.00
100,000.00
Concrete mixing equipment
500,000.00
500,000.00
Columbia Company good will
293,521.65
293,521.65
1941 income tax
3,974.25
1942 income tax
16,663.61
New Southeast plant
500,000.00
500,000.00
Postwar rehabilitation
1,333,000.00
1,333,000.00
Postwar credit
26,134.38
Federal income tax - 1944
109,112.96
D.C. income tax
10,846.38
19,608.22
Replacement sand and gravel
2,578.05
Total
$4,261,034.57
$4,482,913.16
*235 (a) Accrued Bond Interest Petitioner's bonded indebtedness stood at $615,500, principal amount, throughout the taxable period. Keeping its accounts on a cash disbursement basis, petitioner did not accrue the interest on this bonded indebtedness. Interest was paid out of the reserve only when bonds were retired. The interest paid on the bonds retired in 1934 and over the period 1937-1942 amounted to $1,726,697.69. Moratoriums were executed by petitioner and L. E. Smoot extending the time for payment of both principal and interest on the bonds to September 22, 1957. (b) Contract Bonds This reserve was entered in petitioner's books as of December 31, 1936, and remained at $250,000 throughout the taxable years. Petitioner deemed this reserve necessary since it did not obtain performance bonds with respect to any of its job contracts. (c) Workmen's Insurance This reserve was placed on petitioner's books December 31, 1936, in the amount of $150,000 and was increased to $200,000 December 31, 1950. All of the amounts paid out by petitioner during the taxable years under its liability as a self-insurer have been paid out of operating expenses and no charges have been made against *236 the reserve. (d) Public Liability This reserve was placed on petitioner's books December 31, 1936, in the amount of $100,000 and was increased to $200,000 on December 31, 1946. It was for the purpose of meeting liabilities which might result from damage to the property of others caused by accidents or otherwise in the course of business operations. Petitioner's liabilities of this nature have been small and have been paid and deducted as operating expenses in the year incurred. (e) Fire and Tornado Insurance This reserve, in the amount of $250,000, was placed on petitioner's books December 31, 1936. As indicated, it was intended to cover losses from fire and tornadoes. No charges have been made against this reserve. Petitioner has sustained losses from fire and from the sinking of some of its floating equipment but the replacements or repairs were paid out of general surplus and either charged to operating expenses or capitalized. (f) Reserve for Sand and Gravel Replacements This reserve, in the amount of $100,000, was placed on petitioner's books on December 31, 1936. It was intended to provide a fund for the purchase of sand and gravel deposits to replace those which *237 were becoming depleted or which might be taken over by the Federal Government. There have been no charges against this account. Such properties were purchased in 1948 out of petitioner's regular surplus account. (g) Reserve for Purchase of Concrete Mixing Equipment This reserve of $500,000 was placed on petitioner's books December 31, 1936, at a time when petitioner was threatened with having to go into the ready-mix concrete business in order to maintain its position in the industry. (h) Columbia Company Good Will This reserve of $293,521.65 was described as a bookkeeping entry to offset an asset entry of the same amount in petitioner's balance sheets representing the value of the good will of the Columbia Sand & Gravel Company. (i) New Southeast Plant This reserve of $500,000 was placed on petitioner's books December 31, 1942, at a time when the District of Columbia had commenced condemnation proceedings against petitioner's Southeast plant to make way for a proposed new bridge. The plant, as a whole, was not condemned but under an agreement between the parties a part of petitioner's equipment was moved to another location. The cost of moving this equipment was charged *238 to operating expenses. (j) Postwar Rehabilitation This was the largest of the reserves, amounting to $1,333,000. It was set up in contemplation of a program for the complete rehabilitation of petitioner's equipment and an expansion of its business. No such program was ever commenced or formulated during the taxable years. (k) Federal Income Tax This reserve of $109,112.96 was maintained to cover the payment of additional Federal income taxes which might be determined by the Commissioner. The parties have filed a lengthy stipulation of facts, with numerous exhibits attached, which is incorporated herein by this reference. For each of the years 1927 to 1953, inclusive, petitioners' total net taxable income, the amount of Federal income tax paid, the amount of principal paid on indebtedness, and the amount of capital expenditures for equipment, buildings, sand and gravel deposits, etc., were as follows: Amount Paid as
Capital Expendi-
tures for Machinery,
Equipment, Build-
Amount Paid on
ings, Furniture,
Total Net
Amount of
Principal of
Fixtures and Sand
Federal
Taxable Income
Income Tax Paid
Indebtedness
and Gravel Deposits,
Date
for Year
During Year
During Year
etc. During Year
1927
$ 190,548.86
$ 37,937.42
$ None
$ 31,367.53
1928
369,562.67
62,286.31
None
98,011.04
1929
448,293.21
63,063.83
None
224,138.77
1930
449,785.37
46,995.73
None
110,419.24
1931
1,052,939.32
37,123.41
None
63,972.41
1932
913,979.61
118,809.97
None
764,690.90
1933
315,031.78
118,774.33
None
91,072.00
1934
439,913.99
6,416.21
400,000.00
208,588.22
1935
515,799.16
53,001.79
439,966.29
51,926.54
1936
453,667.41
208,476.84
415,382.07
52,145.53
1937
350,590.91
70,731.91
304,472.59
65,703.08
1938
404,774.12
90,825.45
350,000.00
165,748.93
1939
736,667.52
65,258.32
432,000.00
113,185.30
1940
743,018.11
115,726.95
450,000.00
3,271.02
1941
740,695.00
326,289.81
271,000.00
41,642.21
1942
964,588.79
240,028.90
381,500.00
50,362.94
1943
557,547.55
527,148.85
None
1,744.14
1944
302,106.79
212,139.48
None
625.00
1945
338,281.36
109,112.96
None
156,641.89
1946
371,388.24
112,967.19
None
6,821.54
1947
562,889.04
122,981.72
None
162,316.77
1948
499,884.41
196,301.59
None
218,260.02
1949
301,953.11
268,675.62
None
185,611.22
1950
673,200.29
401,158.68
None
41,707.47
1951
331,823.53
259,225.72
None
104,984.26
1952
417,312.96
153,599.54
None
167.75
1953
366,309.70
190,810.15
None
20,970.91
Total
$13,812,552.81
$4,215,868.68
$3,444,320.95
$3,036,096.63
*239 At the beginning of 1945 petitioner had accumulated earnings and reserves of $6,197,061.88. Petitioner's balance sheets at the close of the years 1945 to 1950, inclusive, show the following assets and liabilities: Assets
Dec. 31, 1945
Dec. 31, 1946
Dec. 31, 1947
Cash
$2,950,115.64
$3,209,133.31
$3,311,060.72
Notes and Accounts Receivable
106,563.36
179,721.60
192,233.13
Less Reserve
12,500.00
12,500.00
12,500.00
Net Notes and Accounts Receivable
94,063.36
167,221.60
179,733.13
Inventories
47,619.01
65,765.87
65,719.43
Investments: Obligations of U.S., State, etc.
1,324,531.72
1,344,756.72
1,268,756.72
Other Securities
7,922.34
7,822.34
7,822.34
Loans Secured and Unsecured
1,212,920.99
1,144,166.39
1,432,971.09
Less Reserve
121,292.10
114,416.64
143,297.11
1,091,628.89
1,029,749.75
1,289,673.98
Land
418,816.49
417,820.20
417,820.20
Buildings
359,644.46
359,644.46
359,644.46
Machinery and Equipment
1,925,790.78
1,932,612.32
2,094,430.16
Furniture and Fixtures
8,671.46
8,671.46
9,130.39
Total Depreciable Assets
2,294,106.70
2,300,928.24
2,463,205.01
Less Reserve
1,692,693.13
1,769,730.39
1,846,400.08
Net Depreciable Assets
601,413.57
531,197.85
616,804.93
Dredging Rights
522,425.17
522,425.17
522,465.17
Less Reserve
348,685.16
348,685.16
348,685.16
173,740.01
173,740.01
173,780.01
Good Will Col. Sand and Gravel
Company
293,521.65
293,521.65
293,521.65
Prepaid Insurance
545.15
149.80
0
Deposit (new scows)
0
0
0
Total Assets
$7,003,917.83
$7,240,879.10
$7,624,693.11
Liabilities and Capital: Accounts Payable
$ 1,092.59
$ 1,446.25
$ 1,275.17
Bonds and Notes
615,500.00
615,500.00
615,500.00
Res. for Ins. Replace. and
4,298,728.25
4,347,084.39
4,464,566.42
Contingencies Replace. Res. Sand
and Gravel
Surplus
2,088,596.99
2,276,848.46
2,543,351.52
Total Liabilities and Capital
$7,003,917.83
$7,240,879.10
$7,624,693.11
*240 Assets
Dec. 31, 1948
Dec. 31, 1949
Dec. 31, 1950
Cash
$2,971,795.84
$3,213,854.38
$3,332,387.37
Notes and Accounts Receivable
211,176.94
24,786.03
206,071.60
Less Reserve
12,500.00
12,500.00
12,500.00
Net Notes and Accounts Receivable
198,676.94
12,286.03
193,571.60
Inventories
74,390.15
64,950.23
59,929.91
Investments: Obligations of U.S., State, etc.
1,261,256.72
1,253,756.72
1,200,425.00
Other Securities
7,822.34
7,822.34
7,522.34
Loans Secured and Unsecured
1,924,048.23
1,811,343.23
1,852,786.52
Less Reserve
192,404.82
181,134.32
185,278.65
1,731,643.41
1,630,208.91
1,667,507.87
Land
414,820.20
415,020.20
411,847.67
Buildings
347,818.96
347,818.96
350,255.20
Machinery and Equipment
2,293,959.12
2,479,370.34
2,535,444.91
Furniture and Fixtures
12,686.95
12,686.95
12,686.95
Total Depreciable Assets
2,654,465.03
2,839,876.25
2,898,387.06
Less Reserve
1,924,507.00
2,013,792.83
1,994,733.87
Net Depreciable Assets
729,958.03
826,083.42
903,653.19
Dredging Rights
526,990.17
521,962.87
521,962.88
Less Reserve
352,097.16
359,054.16
363,685.16
174,893.01
162,908.71
158,277.72
Good Will Col. Sand and Gravel
Company
293,521.65
293,521.65
293,521.65
Prepaid Insurance
0
0
0
Deposit (new scows)
0
0
43,235.21
Total Assets
$7,858,778.29
$7,880,412.59
$8,271,879.53
Liabilities and Capital: Accounts Payable
$ 1,253.22
$ 330.46
$ 9,573.61
Bonds and Notes
615,500.00
615,500.00
615,500.00
Res. for Ins. Replace. and
4,623,732.11
4,566,666.38
4,738,103.32
Contingencies Replace. Res. Sand
and Gravel
Surplus
2,618,292.96
2,697,915.75
2,908,702.60
Total Liabilities and Capital
$7,858,778.29
$7,880,412.59
$8,271,879.53
*241 Included in the above assets as "Loans Secured and Unsecured" was a first trust note of $1,074,838.33 on the property known as the Southern Building in the District of Columbia. Petitioner purchased the note from the Metropolitan Life Insurance Company after the property had been acquired by L. E. Smoot at a foreclosure sale in 1933. L. E. Smoot is president and chairman of the board of directors of Columbia Sand & Gravel Company, Inc., as well as the petitioner corporation, and controls the policies of both corporations. He had the power at all times during the taxable years involved to cause petitioner's earnings to be distributed to Columbia Sand & Gravel Company, Inc., and through that company to himself, at his own pleasure. Petitioner did not at any time during the taxable years approve by appropriate corporate action any definite plan for the expansion of its business or for any material change in the method or scope of its operations. Petitioner paid dividends of $20,000 in 1928 and $800,000 in 1932. It paid no further dividends up to the close of the year 1950. During each of the taxable years 1945 to 1950, inclusive, petitioner's earnings and profits were permitted *242 to accumulate beyond the reasonable needs of the business. During each of the taxable years 1945 to 1950, inclusive, petitioner was availed of for the purpose of preventing the imposition of surtax upon its shareholders and the shareholders of another corporation, Columbia Sand & Gravel Company, Inc., by permitting its earnings or profits to accumulate instead of being distributed. Opinion Respondent has determined that petitioner was availed of during each of the years 1945 to 1950, inclusive, for the purpose of preventing the imposition of surtax upon its sole stockholder, the Columbia Sand & Gravel Company, Inc., and on L. E. Smoot, the owner of all of the common stock of that company, through the medium of permitting its earnings and profits to accumulate instead of being divided or distributed, thereby incurring liability for the surtax imposed by section 102 of the Internal Revenue Code of 1939. [1] Respondent's position is that, as a result of the failure to distribute petitioner's earnings, there have been during that period total tax savings to L. E. Smoot and Columbia of $1,177,806.76. This, petitioner does not deny. *243 It is petitioner's contention that its accumulated earnings in all the taxable years were considerably less than the amounts actually needed in its business. It estimates its financial needs at over $13,500,000 in 1945, with increases to $15,500,000 in 1950. These estimates are approximately twice the amounts of its combined surplus and contingent reserves. Petitioner has undertaken in this proceeding to show that its accumulation of earnings and profits was for sound business reasons and hence was not for the inhibited purpose ascribed by respondent. It has offered the testimony of a number of witnesses, including its own officers and other persons familiar with its operations as well as experts who prepared studies of various phases of its business. The testimony of these witnesses gives a fairly clear picture of petitioner's operations from the inception of the business. Under the guidance of its founder and principal owner, L. E. Smoot, petitioner's business grew from a small beginning, over 50 years ago, to its present position as one of the area's largest industries. It has had net earnings in every year since 1927 in amounts ranging from approximately $200,000 to over *244 $1,000,000. Its policies have always been conservative, both as to expansion of the business and as to the distribution of earnings. The only substantial dividend payment, amounting to approximately $800,000, was in 1932. In his individual return for that year, L. E. Smoot reported dividends of $800,000 and claimed loss deductions of over $600,000. Petitioner's surplus at December 31, 1927 was $3,177,928.19. It had no contingent reserve accounts in its books at that time. At December 31, 1944, and at the beginning of the first taxable year here involved, its surplus and contingent reserves combined amounted to $6,197,061.88, and at the close of 1950 they were $7,646,805.92. For our present purpose, the contingent reserve may be regarded as a part of petitioner's general surplus. No funds were ever actually set aside for any of the reserve accounts and no deductions were claimed for them in petitioner's returns. Petitioner's officers considered the reserves as mere bookkeeping entries. The statute makes the accumulation of earnings and profits "determinative of the purpose to avoid surtax, *245 " unless the corporation proves to the contrary by a clear preponderance of the evidence. Petitioner has failed to produce any such evidence and, in fact, there is no real proof, and probably no real contention, that if the accumulations were beyond the reasonable needs of the business there was any other purpose than the avoidance of surtax. [2] On the other hand, respondent apparently concedes that if petitioner has shown that the surplus was not in excess of the reasonable needs of the business, nothing further is required. The sole and critical issue, accordingly, is whether the earnings and profits accumulated by petitioner were in excess of the reasonable needs of its business. This is a question of fact to be determined from the evidence as a whole. Helvering v. National Grocery Co., 304 U.S. 282; Helvering v. Chicago Stock Yards Co., 318 U.S. 693; Al Goodman, Inc., 23 T.C. 288. In its brief, petitioner lists its minimum financial needs for each of the taxable years as follows: Working
Loans to
Plants and
Ready-Mix
Year
Capital
Customers
Equipment
Business
Total
1945
$3,000,000
$ 72,917
$4,366,489.38
$5,500,000
$12,939,406.38
1946
3,000,000
None
4,989,180.72
5,500,000
13,489,180.72
1947
3,000,000
135,000
5,805,674.79
5,500,000
14,440,674.79
1948
3,000,000
150,000
6,202,949.51
5,500,000
14,852,949.51
1949
3,000,000
None
6,558,447.59
5,500,000
15,058,447.59
1950
3,000,000
92,505
6,700,733.16
5,500,000
15,293,238.16
*246 Petitioner's estimate of $3,000,000 for working capital includes its liability as a self-insurer. It has been held that the accumulation of funds to meet operation expenses for at least 1 year is reasonable. J. L. Goodman Furniture Co., 11 T.C. 530. Petitioner's total expense deductions for the taxable years, as shown in its profit and loss statements, *247 averaged about $500,000 per year. That would leave $2,500,000 for insurance. The evidence before us affords no standard for measuring the amount of insurance reserves which a corporation might need for self-insurance. According to an estimate prepared for petitioner by a competent insurance broker, the premiums on the insurance which petitioner would have needed to cover its liabilities of all types for the 1945-1950 period, would have amounted to approximately $145,000 a year. However, this does not solve our problem. We have no means of relating these premiums to a proper reserve for contingent losses. It might be reasonable to assume that the cash reserve needed to cover the risks in any year would have been an amount greater than the premiums, but how much greater we do not know. Even if we add the premiums for the entire 5-year period they would fall far short of $2,500,000. We do not know whether there are available any actuarial data from which sound reserve figures could be derived. This is a field of speculation in which the Tax Court should not be asked to venture without competent guidance.
We cannot accept as dispositive of this phase of the issue what appears to be *248 petitioner's conclusion that had it carried standard insurance protection the sum of the annual premiums over the 1927-1953 period and the amount paid by petitioner for Federal income tax, for reductions of its indebtedness, for capital assets, and for dividends would have exceeded its total net taxable income. In determining the reasonable needs of the business the period under review must stand on its own feet. Koma, Inc. v. Commissioner, (C.A. 10) 189 Fed. (2d) 390 (affirming T.C. Memorandum Opinion, December 14, 1949 [8 TCM 1064,]). The accumulated premiums themselves in any given year might have constituted an unreasonable reserve for petitioner's insurance risks of that year. For instance, by 1950 they would have amounted to approximately $3,450,000, a figure far beyond any need shown for insurance reserves for that year. The total of the insurance reserves which petitioner carried in its books amounted to $500,000 in 1944 and $650,000 in 1950. We have not been convinced that these figures did not represent the best judgment of petitioner's officers as to its insurance needs at the time. Petitioner's actual losses were almost negligible. They *249 were paid out of current earnings and the replacements were either charged to expenses or capitalized. In the absence of more valid proof we cannot find that petitioner had need for larger insurance reserves in any of the taxable years than the amounts shown in its books. Petitioner made loans to its customers in 1945, 1947, 1948, and 1950 averaging approximately $112,000 a year. These loans were for such purposes as aiding customers to establish themselves in business and to finance building projects for which petitioner would furnish sand and gravel. The evidence is that they were to petitioner's business advantage and, we think, were therefore within the reasonable needs of the business. The largest single item of the listed financial needs is for plants and equipment. It amounts to over $4,366,000 in 1945 with increases each year thereafter to over $6,700,000 in 1950. Petitioner's books showed reserves, at December 31, 1950, of $500,000 for a new plant, $1,333,000 for postwar rehabilitation, and $100,000 for sand and gravel replacement in each of the years 1945 to 1950, inclusive. The figures now produced by petitioner are derived from a report made for it by American Appraisal *250 Company in 1953, 3 years after the latest year presently involved. It was a physical impossibility for petitioner's officers to have that report before them in the years 1945 to 1950. And there is no evidence that such a program or comparable figures were ever seriously considered by petitioner or its officers during the critical period. The Appraisal Company report was based on the assumption of a production of 1,500,000 cubic yards of sand and gravel per year. Except for the forced production of the war years, petitioner's output has never approached that figure. Large segments of the report were based upon information given to the Appraisal Company by petitioner's officers at the time the report was prepared - in other words, years after the time when their state of mind was significant. There is no evidence here from which we can conclude that a real subsisting and articulated plan of expansion, such as that assumed in the report, was ever a seriously considered possibility in the minds of those who determined petitioner's policy. There is evidence that for a long period of time petitioner's officers had considered the matter of rehabilitating and expanding petitioner's business *251 on a large scale, but no definite plan was ever commenced by petitioner or approved by proper corporate action, and has not been up to the present time. In the meantime, petitioner has been adding to its equipment from year to year. It gradually replaced all of its wooden scows with steel scows. Ten steel scows were purchased in each of the years 1945, 1947, 1948 and 1949 at a total cost of approximately $665,000. One tug was acquired in 1948 at a cost of $18,817.97, and another in 1950 at a cost of $36,159.82. Other lesser equipment and dredging rights were acquired over that period. These expenditures were all made out of current earnings or general surplus and were not charged against any of the reserves in petitioner's books. Petitioner's yearly earnings varied from about $300,000 to over $670,000 over the 1945-1950 period. It has been the consistent holding of the courts that to be effective for the purpose of preventing the imposition of the section 102 surtax a plan for business expansion must have substance as an existing reality in the years involved. It is not enough that a nebulous *252 plan may have passed through the minds of the taxpayer's officers and directors without any definite commitments. See Koma, Inc. v. Commissioner, supra; Bride v. Commissioner, (C.A. 8) 224 Fed. (2d) 39. In Gus Blass Co., 9 T.C. 15, 36, we said: "An accumulation of earnings for the construction of new buildings may be reasonable under certain conditions, General Smelting Co., 4 T.C. 313, 323; but where, as here, nothing has been agreed upon and no definite action has been taken, and it further appears that the corporation in the taxable year had available funds sufficient to finance any proposed construction, there is no justification, on such grounds, for further accumulating earnings in the current year. * * *" It has been held, too, that a purpose to use accumulated earnings for expansion at some future date may coexist with another purpose to avoid the tax on distributions to the stockholders. See Whitney Chain & Mfg. Co., 3 T.C. 1109, affd. (C.A. 2) 149 Fed. (2d) 936; Nipoch Corporation, 36 B.T.A. 662. *253 It is the total absence of a purpose to avoid the tax on distributed earnings which is required. R. L. Blaffer & Co., 37 B.T.A. 851, affd. (C.A. 5) 103 Fed. (2d) 487, certiorari denied 308 U.S. 576. We think that the reserves shown in petitioner's books for plants, postwar rehabilitation and sand and gravel deposits were adequate for petitioner's needs in the taxable years, and there is nothing to convince us that they were not so considered at that time. The next and final item in petitioner's estimated financial needs is the $5,500,000 for entering into the ready-mix concrete business. This figure is said to represent the minimum amount that petitioner would have been required to expend in any of the taxable years if it had decided to enter the ready-mix concrete field. A reserve of $500,000 for "concrete mixing equipment" was carried in petitioner's books. Again, as with the reserve for plants and equipment, the petitioner has never entered the ready-mix concrete business and has never intended to do so, except possibly as a defensive measure against a boycott by its ready-mix concrete customers. While there may have been some grounds *254 for concern about the matter it was never anything more than a threat. Mr. Smoot testified that it has always been, and is now, his wish to stay out of the ready-mix business. There are several reasons why, in our opinion, this reserve of $5,500,000 was not justified in any of the taxable years. In the first place, as we have said, petitioner never planned or intended to go into the ready-mix business of its own free will and the contingency which might have forced it to do so never developed. Secondly, since any distribution of petitioner's earnings and profits ultimately would have gone to Mr. Smoot or to Columbia Sand & Gravel Company, Inc., which he controlled, the money would still have been available to petitioner for such an emergency, even if distribution had been made. In this connection the Supreme Court said in Helvering v. National Grocery Co., supra, at 938: "Since Kohl was the sole owner of the corporation, the business would have been as well protected against unexpected demands for capital, and assured of capital for the purpose of any possible expansion, by his personal ownership of the securities as by the corporation's owning them. * * *" See, also, Helvering v. Chicago Stock Yards Co., supra. *255 The above estimates do not include any reserves for bonded indebtedness or additional income taxes. The principal amount of the bonded debt stood at $615,500 during all of the taxable years and, in fact, since 1942 when the last payments of principal and interest were made. Interest was paid only as the bonds were retired. There have been moratoriums extending payments of principal and interest to 1957. The reserve for accrued interest was shown on petitioner's books as $615,203.29 on December 31, 1944, and $836,783.29 on December 31, 1950. In its brief, petitioner makes the argument that: "During the 1945-1950 period petitioner's bond indebtedness owing to its sole stockholder was from more than 3 1/2 times to almost 15 times greater at the end of each year than was the alleged improperly accumulated Section 102 net income for each such year. The evidence makes it plain that if at any time during the 1945-1950 period petitioner had felt that it could safely pay out any part of its earnings to its stockholder those earnings would have been paid on the bond indebtedness and not as dividends. The Internal Revenue Code does not penalize the failure, if any, to pay bond indebtedness *256 to a stockholder. Consequently, as a matter of law Section 102 penalty surtax cannot properly be imposed in this case." The fact that petitioner's bonded indebtedness exceeded its net income in each of the taxable years adds nothing to petitioner's case. A comparison of a taxable year's net income with outstanding obligations is not a test under section 102. What is called for is a comparison of accumulated earnings or profits with the financial needs of the business, in order to ascertain whether there is any need for further accumulation of earnings or profits. The bonded indebtedness was small compared with petitioner's accumulated earnings and its net worth. Moreover, the evidence does not show that petitioner intended to pay either principal or interest on the bonds during the taxable years, or at any foreseeable time thereafter. No such payments have been made up to the present time and they can be postponed indefinitely at Mr. Smoot's pleasure. It is not likely that petitioner's failure to pay the principal or interest on its bonds was due to any financial stringency. Both surplus *257 and liquid assets were high up in the millions, and if any advantage had been anticipated, we think at least the interest and probably the principal of the indebtedness could easily have been discharged. Its sold stockholder's moratorium on both principal and interest payments until 1957 cannot readily be explained on that ground. But another explanation does not seem implausible. Respondent's uncontradicted assertion is that petitioner's original capitalization was composed of $15,000 of common stock and $3,000,000 of bonds. Such a ratio has at times been characterized as "thin capitalization." As a result the bonds might have been treated as though they were really common stock, the interest payments as dividends not deductible by petitioner, and, quite possibly, payments of principal out of earned surplus as a redemption of stock, and hence as the equivalent of a dividend to the shareholders. See John Kelley Co. v. Commissioner, 326 U.S. 521; Swoby Corporation, 9 T.C. 887. That at least was the theory on which respondent determined deficiencies against petitioner, Columbia Sand & Gravel Company and L. E. Smoot for some of the years prior to 1945. It *258 is true that no adjudication of that question has occurred, and that the claims were settled without litigation. But it seems not unreasonable that petitioner, far from being unable to pay a few thousand dollars a year, might have wanted to eliminate the payments of principal and interest on the indebtedness as a means of avoiding repetition in subsequent years of respondent's attempt to collect taxes on the stockholders. The additional tax liabilities determined against the petitioner for the years 1940 to 1944, inclusive, which were outstanding at the close of the years 1945 to 1950, inclusive, rose from less than $1,000,000 in 1945 to a peak in 1948 of $1,794,562, including interest. We recognize, of course, that petitioner was entitled to maintain a cash reserve sufficient to pay any tax liabilities which had been determined against it, except perhaps section 102 tax. At the same time, however, it is perfectly obvious that petitioner at all times during the 1945-1950 period had sufficient ready capital on hand over and above all asserted needs. A word may perhaps be appropriate as to *259 the size of the tax liabilities claimed by petitioner to have existed in the taxable years. Petitioner adds to its own deficiencies those determined against Columbia, its sole stockholder, and Smoot, Columbia's sole stockholder. But while petitioner may have been entitled to retain funds for the payment of its own indebtedness, we think it clear that no supposed liabilities involving its immediate and remote stockholders, could be characterized as a need of its business. A distribution of its profits would have put those stockholders in funds so that they in turn could meet whatever tax liabilities might ultimately be imposed. Petitioner argues that it was prevented from carrying out its program of expansion and rehabilitation, first, by World War II, second, by the antitrust suits, and, finally, by the Government's tax claims against it. World War II ended in 1945. The antitrust suits were withdrawn in 1945. Petitioner's tax liabilities for the years 1940 to 1944, inclusive, were settled by a decision of the Tax Court in The Smoot Sand & Gravel Corporation, Docket No. 12722, dated October 5, 1949. Petitioner later paid the deficiencies determined against it in 1949 and 1950 in the *260 aggregate amount of $302,400. Yet, as late as 1954, no expenditures of any magnitude for any of the purposes relied upon had even been contracted for. The total of the contingent reserves shown in petitioner's books at the end of each of the years 1944 through 1950 amounted to about $4,500,000. They included among the larger items, at December 31, 1950, $500,000 for concrete mixing equipment, $1,333,000 for postwar rehabilitation, $500,000 for a new southeast plant, $836,783.29 for accrued bond interest, and $650,000 for insurance. According to petitioner's balance sheets, it had on hand in each of the taxable years cash and Government securities of over $4,000,000 (the average was about $4,400,000), and mortgages and loans of from approximately $1,144,000 to over $1,900,000. Petitioner's net worth increased from approximately $5,612,000 in 1945 to over $6,535,000 in 1950. The mortgages and loans included the mortgage note of over $1,000,000 on the Southern Building in Washington, D.C., which had been purchased by Mr. Smoot, individually. Without concluding that any reserves were proper, and still less undertaking to state the exact figures which, in our opinion, represent the *261 maximum amounts allowable under each separate item as a reasonable reserve for petitioner's business needs in each of the taxable years, it is plain, from the foregoing discussion of the items, that the total does not reach petitioner's accumulated earnings in any of those years. Even assuming, however, that petitioner has shown a reasonable need in its business for the entire amount of accumulated earnings at the beginning of each of the taxable years, it would still be subject to section 102 surtax in the absence of a showing that it needed to accumulate the current earnings further. We think the evidence fails to show that petitioner had reasonable business needs for accumulation of the earnings or profits for any of the taxable years under consideration. We are aware, of course, that the judgment of neither the respondent nor the Tax Court can be substituted for that of petitioner's responsible officers, in the management of its business affairs. However, we think the record, and particularly petitioner's own reserve accounts, demonstrate what in the judgment of petitioner's officers *262 was required for its business needs. Cf. World Pub. Co. v. United States, (N.D., Okla.) 72 Fed. Supp. 886. Within those figures there must be contained the best evidence as to what was the contemporary judgment of petitioner's management as to its future needs. There is nothing in the evidence to demonstrate that for the years in controversy petitioner's surplus and accumulated earnings were not already sufficient to satisfy those needs. Petitioner makes the further contention that respondent's determination that it is subject to surtax under section 102 is invalid because the respondent did not ascertain what would have been the tax consequence to petitioner's stockholders if the distributions had been made. The facts set out above show that the Commissioner's representatives made the determinations of the deficiencies under section 102 in the regular performance of their duties. Petitioner was given notice of the determination and conferences were held between representatives of the Commissioner and petitioner. The Commissioner's representatives had within their own files all of the information required for determining the tax liabilities of petitioner, the Columbia *263 Sand & Gravel Company and L. E. Smoot, individually. The Commissioner's determination that petitioner is subject to section 102 surtax carries, inferentially, the determination that the failure to make the distribution of earnings resulted in tax savings to the stockholders. J. M. Perry & Co., Inc. v. Commissioner (C.A. 9) 120 Fed. (2d) 123 (affirming B.T.A. Memorandum Opinion, March 5, 1940). In sum, the record shows that petitioner, with a single ultimate stockholder, has had a thriving and prosperous business for many years, yet, for almost a quarter of a century, it failed to pay a single dividend taxable to its stockholder in full, and, except for one year, it paid no appreciable dividend whatever; that over those years it accumulated earnings of millions of dollars; that at the beginning of the period in controversy it had a surplus, including bookkeeping reserves, of over $6,000,000; that its cash and current assets not actually used in the business were even greater; that one investment in the amount of over $1,000,000 was not really liquid but was more in the nature *264 of a loan to its ultimate individual stockholder; that there were no reasonable needs of the business not represented by the book reserves; that petitioner's surplus at the beginning of the period was such that no need of the business for the current accumulations could be justified; and that the failure to distribute resulted in surtax savings during the years in issue of almost $1,200,000. Respondent's determination that petitioner was liable for section 102 tax carries with it, by inference, a determination that the accumulations were beyond the reasonable needs of the business, and petitioner's evidence has not overcome the presumption of correctness attaching to that determination. Since we have found on the record that the accumulations were beyond the reasonable needs of the business, and that petitioner has not shown by a clear preponderance of the evidence that any other purpose existed than the one penalized by section 102, respondent's determination must be sustained. Decisions will be entered for the respondent. Footnotes
1. SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS. (a) Imposition of Tax. - There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following: * * *
(c) Evidence Determinative of Purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.↩
2. RECROSS-EXAMINATION By Mr. Waring: Q. Mr. Smoot, is it a fair statement that the reason you have not had these earnings and profits distributed to you through the Columbia Sand & Gravel Company is because you would have to pay a 90 percent surtax rate on that income if you received it? A. No. Q. The fact is you would pay a 90 percent rate, would you not, if you did? A. I would more than that by the time it had been taxed by the corporation tax, the Columbia tax, and a tax to me. I think it would have been more than 90 percent. Am I right? Q. And it would have been foolish as far as you are concerned to have had that income distributed to you? A. Perfectly foolish and, besides, we needed the money in the business.↩